Good morning. I'd like to acknowledge on the bench Judge Lewis Pollack of the United States District Court for the Eastern District of Pennsylvania. Judge Pollack, we can't do our work. Some of you may not think we do it so well, but anyway, we can't do the work that we do without the, we're down two judges, without the assistance of some of the district judges throughout the circuit and visiting judges. Later this week, Judge Barry and I will be sitting with a visiting judge. Judge Pollack is one of our frequent and favorite guests, and so on behalf of Judge Barry, myself, and the entire court, I want to publicly acknowledge and thank Judge Pollack. I thank you very much, Judge Slover. It's always a delight to sit with your court. And especially Judge Barry and me. Especially Judge Barry and you. But I didn't mean to interrupt you if you had more to say about me. Well, I'll leave that for another time. We will begin with Pharmacia v. Motor Carrier. Do you want to add to this love affair? I think you've said it beautifully, Judge Slover. Thank you very much. And I'll say more to Judge Pollack privately. I saw that. Good morning, Your Honors. May it please the Court, my name is Roy Englert, and I represent Defendant Appellants, Motor Carrier, CSX Intermodal, and CSX. I'd like to reserve three minutes for rebuttal. That's granted. For purposes of oral argument, I'd like to focus on three things. What the 1994 agreement means, whether Motor Carrier was prejudiced by Pharmacia's failure to give required notices, and vicarious liability. I plan to discuss the NOAA claim only briefly if there's time at the end, but I do urge the Court to reverse on that for the reasons given in our brief. What is the status of the various governmental remediations, all three of them? They are ongoing, Your Honor, and I think it's fair to say they are ongoing slowly. They are very long-term proceedings. Does all government work? Yes. Is there an end date there? No. Okay, thank you. It's a very expensive parking lot, isn't it? We hope not, Your Honor. As of today, it's a very expensive parking lot. That's certainly true. It's her area of the world. Yes. Are we to regard this as a diversity case? It is a diversity case among other bases of jurisdiction, Judge Pollack, yes. But you also said that there's a series of federal questions. There are federal questions which the District Court didn't reach, so there would be pendant jurisdiction as well, but it is a diversity case. Section 2.3 of the agreement, as you know, provides for motor carriers to be responsible for certain migrations of pollutants from the CARNEY site. It refers to one, government-ordered cleanup, and two, voluntary cleanup. And those references are followed by the critical phrase, in each case of substances present at or which migrate from the CARNEY site at any time after the effective time. The District Court held that the modifying phrase applied only to voluntary cleanup, not to government-ordered cleanup. But that has to be wrong for a very simple reason. The modifying phrase begins with the words, in each case. The District Court made no attempt to explain how the words, in each case, can refer to anything other than the two types of cleanup just listed and set off by Roman numerals. Pharmacy as witness about contract negotiation, Felder, also made no attempt to explain those words. In fact, I need to point out, because of all the emphasis Pharmacy has briefed places on Felder's testimony, that every time a lawyer for either side tried to ask him about what any phrase of the agreement meant, Judge Brown sustained an objection because the words of the agreement speak for themselves. That's at pages 240, 245 to 46, 273 and 280 of the Joint Appendix. So this case really does need to be resolved on appeal, just as it was resolved in the District Court by reference to the words of the agreement, not through deference to supposed factual determinations. Now getting back to Section 2.3 and the in each case language, candor does compel me to admit that the modifying phrase is not repeated in Sections 2.4 and 2.5. But the most natural explanation of the party's failure to repeat that phrase is that it was deemed unnecessary after Section 2.3 had so clearly delimited the purchaser's responsibilities. The least natural explanation is the one Pharmacia offers this Court, that the parties intended through Sections 2.4 and 2.5. Well, implicit in what you've just said is that there are two interpretations of the ambiguity in 2.3. And the District Court, while there is force to yours, the District Court believed there was greater force to the one that he adopted. Is that not a factual finding entitled to be reviewed under the clearly erroneous standard? It's not, Your Honor. Under New Jersey law, contract interpretation and construction are both questions of law. Well, there's a difference between construction and interpretation, is there not? Not in New Jersey, Your Honor. There is under the Third Circuit case law interpreting arbitration causes, which are construed by reference to federal law. But in New Jersey, both are treated as matters of law and appeal. But there's another important principle in New Jersey law here, and that is if there is ambiguity in this contract of indemnity, it must be construed against the indemnity. We suggest that Section 2.3 is clearly in our favor and that Sections 2.4 and 2.5 don't negate it so that the contract is unambiguous in our favor. But if we're wrong about that, the right result to reach in this case would be to say that the contract is ambiguous and therefore should be construed against the indemnity against Pharmacia. Now, if and only if I – New Jersey, because I think I missed that. What is the New Jersey case law that establishes that both elements would be matters of law? I think you said that under the New Jersey cases, as distinct from Third Circuit authority, construction and interpretation would be matters of law. Yes, Your Honor. The Spring Creek holding case, cited on page three of our reply brief, is one of the New Jersey cases saying, in so many words, interpretation and construction of a contract is a matter of law for the court subject to de novo review. And we are also relying heavily on the Ramos and Englert cases from New Jersey, saying that contracts of indemnity or any ambiguity in a contract of indemnity is construed against the indemnity. Now, if and only if I lose the contract construction issue, the court will have to address the issue of prejudice from failure to give the required notices. Now, you don't – you at trial did not say – present any evidence of prejudice. I think that's pretty much conceded, isn't it? Absolutely not, Your Honor. With deference, our position on prejudice is that, as Mr. Clevey of Pharmacia said, Pharmacia had a complete defense. And the complete defense was – But at trial, your position was, was it not that prejudice – even now I think your position is prejudice is presumed. That is correct. Yeah. But there's also evidence of prejudice. And the prejudice is that Pharmacia never – The evidence of prejudice at trial was the Rue Associate Studies from 1992 and 1993 and Mr. Clevey's testimony presented by Pharmacia on direct that Pharmacia had a complete defense. Judge Brown says no one could identify what that complete defense was, but Judge Brown is respectfully mistaken. The complete defense was this plant didn't presume to pollute the Passaic River. That's the defense. But even now you're not saying you had a complete defense. You're saying that you would have had. Well, that's correct because we weren't given the required notices. Yeah, you're saying that the fact that you could have had means that prejudice should be presumed. Yes, that's the New Jersey law, and we think it's appropriate on the facts of this case because we weren't given the notice, yes. What would you have done had you received notice sooner, and when do you claim you received the notice? Well, we received the notice in 2004 of the 1996 EPA General Inquiry Notice. There was 1995 correspondence we received earlier, but the 1996 General Inquiry Notice was not found in motor carrier's files, nor is there any evidence it was ever transmitted. And what would you have done? Would you have taken over the defense? Well, it's speculative, Your Honor. It's inherently speculative. Well, then how can we say that you were prejudiced? Because every time someone complains about lack of notice, that person by definition didn't know. That person by definition has to speculate what he or she would have done. Are you saying there's no prejudice defense to the lack of notice? I mean, if every time somebody can claim they were prejudiced, then I'm not sure where you're taking us. Well, under New Jersey law, there is a presumption of prejudice from a longstanding lack of notice. That's all you're really arguing is a presumption, because you say at page 49, you don't argue that had motor carrier received timely notice, it would have done anything different. You speculate what you could have done, and you don't say that you would have achieved a better outcome than Pharmacia. You could have, and that, you say, is why prejudice is presumed. That's a correct summary of our position, Judge Barry, yes. So I think implicit in that is that there is no evidence of prejudice. Well, I most respectfully disagree with that. The simple case for prejudice is that Pharmacia never presented the Rue Associates study showing that pollutants didn't migrate to the Passaic River to EPA. Instead, it tried to shift blame to motor carrier, which certainly would not have been motor carrier's defense. That is our evidence, and that's why we say in addition to the legal presumption, Judge Brown got it wrong factually and legally. Would you say that there was no evidence that would support Judge Brown's view? No evidence? I think Judge Brown made a, I do say that, Your Honor. Although when we're talking about a finding that there was no evidence in our favor, saying there was no evidence to support his finding is a little bit difficult conceptually. But he mistakenly said that the complete defense that Mr. Cleavey identified was something no one could identify. That's simply not correct. And he failed to apply the presumption of prejudice under New Jersey law. Now, if liability is not overturned entirely, I'm sorry. Do you take it that a presumption is controlling when it's in the face of competing evidence, actual evidence? I wouldn't state such a broad proposition, Judge Pollack. But I think the record of this case is Judge Brown failed to apply the presumption. And when he addressed prejudice, he made plainly mistaken comments about the factual record. He got it wrong legally and factually. If liability is not overturned entirely in this case, the court will have to reach the question of vicarious liability. And there are two such questions, whether to pierce the corporate veil between Motor Carrier and Intermodal and whether CSX, the ultimate parent company, became an insurance affiliate. Well, let's take Intermodal first because, at least for me, that's an easier one. What is the effect of the finding that at the time Motor Carrier, at the time of Intermodal's acquisition of the stock, Motor Carrier had $340,000. It was worth $340,000. That wasn't a factual finding. That was a statement made by Judge Pollack on summary judgment. Isn't it true? It's not true. Absolutely not true. There was a Deloittan II study three months before Intermodal bought Motor Carrier. That was the $14.5 million? It was a $14.5 million acquisition. The Deloittan II study is the $340,000. Yeah. But which is better evidence of the capitalization of a company? What it sold for on the open market? Well, something happens in the three, in the months in between. Can it now? Let me put it this way. Could Motor Carrier now pay a judgment of the magnitude that would be involved in this case? That's not clear, Your Honor, for this reason. It's not clear what the magnitude of the potential liability is in this case. Well, what do you think it is? It's my best guess as I stand here is the magnitude is in the order of $10 million and Motor Carrier could pay it. But I'm speaking extra record. Motor Carrier can pay $10 million? Oh, sure. It has a property that was valued at $14.5 million in 1994, and there is not a scintilla of evidence in the record nor extra record. Is it true that that property has declined in value since 1994? Given the fact that they never had, did any of the corporate formal requirements, they didn't hold any meetings, they didn't, isn't that true? Isn't that what judges have pointed out? There is an absence of corporate formalities, but that's only one part of the test. Well, in pharmacy a request, I think it was the provision 13.19, requested a copy of the balance sheet and the income statement. And it never received them. I'm not aware of any such request. There was a request for assurance that the net worth was more than $5 million, which it was. But they didn't receive the assurance. That's true. The responsive letter did not say that. They did not receive the insurance. Assurance, and it's my understanding of the record, and of course I'm sure you know it better than I do, is that they did request under 13.19, I think the provision is, an income statement and a balance sheet from Motor Carrier and they were never forthcoming. There's an exchange of letters in January of 1998 in which they never referred to section 13.19 and never referred to the term assurance affiliate. But they requested an income statement. No, that's not quite correct either, Judge Barry. If we're talking about the same correspondence. What did they request? Assurance that the net worth of Motor Carrier was at least $5 million. And they didn't get it. No, but when a company sells for $14.5 million, that's prima facie evidence of its net worth. Now even in response to- We're going to keep you obviously longer than your red light because we have a lot of questions. Sure. Okay. In response to a question of Judge Sloviter's a moment ago, you spoke of, you acknowledged that there was, it was a wonderful phrase, an absence of formal corporate activity. Is it not fair to say that Motor Carrier didn't do nothing? Your Honor, what- Make it more elaborate. Well, what Motor Carrier did was it held title to a parking lot. That's what it was formed to do or what it was bought to do, and that's what it did. That's what it's done for 15 years. It was a shell. No, I respectfully disagree with that characterization. Wasn't that the word? I'm not sure. Didn't Judge Branton say that? Maybe not. Well, here's- If I may jump ahead to the last part of the test, what piercing the corporate veil requires is abuse of the corporate form for the purpose of trying to protect assets from liability. When Motor Carrier was bought in 1994, I'm sorry, in 1998, it was a holding company with one major asset, the Kearney property. In 2009, it's a holding company with one major asset, the Kearney property. Nothing has gone in, nothing has gone out, nothing has changed. The corporate form hasn't been abused here. The corporate form has simply been used to take this company, acquire this company, and leave it exactly as Intermodal found it. Are you saying that the ingredient of for the purpose is something that must be developed independently of Judge Brown's finding? But here essentially was, as Judge Sloboda put it, a shell, and I think that may have been Judge Brown's characterization too, which had no function at all except to protect other elements of the CSX group of enterprises from liability. Judge Pollack, I'm not going to quibble with you in part, and I am going to quibble with you in part. I'm going to quibble with the word finding because this was all resolved on summary judgment. Now, I'm not going to quibble with the proposition that all Motor Carrier did was hold title to the Kearney property. That's all it did in 94. That's all it did in 2009. But that's nothing like the kind of abuse of … Well, it's a two-pronged test, isn't it? You've got the corporate form and whether there are meetings and all of those things. And then there's whether or not there is an injustice being perpetrated, which I think Judge Sloboda's question about could Motor Carrier pay a judgment might very much be relevant too. And you've got a potentially big judgment here. In October 1997, it was Motor Carrier's own accountants, I believe, that said it was worth only $340,000. Is that wrong? No, that's correct. So that's its accountants who look at its papers. Right. But if you look at the 1995 and 1996 Deloitte and Touche audits, they show a higher net worth. But the far better evidence of net worth and the only evidence of net worth after CSX actually bought the company is what CSX paid for it. Well, that was Intermodal paid. You're saying CSX Intermodal. I'm distinguishing between Intermodal and CSX because I do have questions about the CSX and the Assurance Affiliate, which I'll ask Fawn to see. Okay. Well, I stand corrected. It was actually CSX Real Property, which bought the title and conferred it to CSX Intermodal. But what was paid for the property in January of 1998 was $14.5 million. And there is not a scintilla of evidence in the record that it's not still worth at least that much money. As far as the second part of the test, which Judge Barry asked me about, I do refer the court to Craig v. Lake Asbestos of Quebec, which is cited not in our brief but in Napoli's brief, which was a case in which it was pointed out that the subsidiary couldn't pay the judgment, but that inability to pay the judgment is not the test. The test is whether corporate formalities have been abused to cause an inability to pay the judgment. So even on facts much, much, much stronger for piercing the corporate veil than the facts we have here, this court reversed a judgment, piercing the corporate veil under New Jersey law. Could we go to liability back? And you take the position that you're not liable for cleanup. You have a different definition of cleanup than we do through that analysis. If we lose on 2.3, we are liable for cleanup. What we're not liable for is irremediable damage that can't be cleaned up. This is the NOAA issue, and I think that's what Your Honor was asking about. Natural resource damages are not cleanup. They are, by definition, that which cannot be cleaned up and for which money is being paid to the natural resources trustee, in this case NOAA, because the damage can't be cleaned up. That's your argument. That's your argument. Yes, Judge Barry, of course. But that's also the definition. It's agreed with you. Well, again, with no process of any kind, Judge Slobiter, this was an issue that came up only – Both of you. My apologies. I wouldn't mind changing places, but that's another story. You don't want to do that. Judge Barry, that came up only – You're welcome to try it with me, too. Judge Barry, that came up only after trial. Yes, I know. And without paying any attention to the terms of CERCLA, without paying any attention to the terms of the agreement, and without any process, Judge Brown held, in the course of an attorney's fee ruling, that NOAA's natural resources damages claim was covered by his prior judgment. We think he's quite wrong. We actually think the Court can reverse and render on that issue because it's so – Well, he dealt with it, according to him, during the trial in another context. There are numerous scattered references to natural resources damages during the trial, but there was no natural resources damages claim that had been asserted at that point. That's true.  are extremely favorable to our side. They point out that natural resources damages are something quite different from remediation under established environmental usage. Well, they may be different, but that doesn't mean that they're not covered. They're not included. Not by itself. Under the definition, cleanup. That's right. It's a very comprehensive definition of cleanup called remediate. I don't have it in front of me. Section 2.1c. Wait. Remedial work mandated. It's defined in 2.3, I guess, little i. It's defined to mean remedial work mandated by a government agency to investigate, remediate, remove, treat, clean up, contain, or prevent the escape of substances on, within, or generated by, emitted, etc. That's pretty broad. It is pretty broad. It just doesn't include damages, which are something separate, because they, by definition, pertain to that which can't be remediated. Okay. Do you have any more questions? Do you have any more questions? Sure. Well, why don't we let you take a rest and you'll come back. And I should tell you, because you're not from this circuit, we don't limit the rebuttal to that which the, as the Supreme Court may, that which your friends on the other side say. So if you have more to say about this. Thank you, First Lady. Thank you. Okay. Thank you. Thank you. May it please the Court. My name is John McGarren. I'm with the law firm of Patton Boggs, and I'm representing Pele Pharmacia Corporation. I wanted to address first something, a question that the panel has raised about the current status of the Passaic River, although there's not a lot in the record itself on this issue. It's of widespread public knowledge that the Passaic River cleanup is a potentially huge liability. EPA has issued a draft focus feasibility study for the river, which includes remedies ranging from about $1 billion to $2.3 billion. So it's a major liability. There are currently somewhere on the order of 75 companies, which include major companies and some are smaller companies, that have signed up to a settlement with the EPA to study the river. Are you reciting matters? You're not reciting matters that are in the record. No, Your Honor. Just there was a question asked by the panel. So I just wanted to, there is a lot of public information on that. It's not in the record, Your Honor. Let me turn. I have one very modest question. As compared with the recital that you've just given, I gathered from your papers that you question this court's authority with respect to January 2008 order. Is that, is it in your view, are you still pressing that jurisdictional argument? Because it's important for us to know what the scope is of what we have before us. Yes, Your Honor. I believe you're referring to the January 19, 2008 order covering the NOAA notice, Your Honor. No. You're saying that that's outside the scope. It was. There was no notice of appeal filed within 30 days. So just under the rules, we don't believe that there's jurisdiction. Given the aggregate procedural course of this case, leading finally to the May 2008 opinion of Judge Brown, would you really segment out what happened in January? Well, the May 2008 order that's labeled final judgment was something that was put together at the request of the CSX entities, Your Honor. It basically recites verbatim the January 19, 2008 order. I can't understand. If you're right, why did the district court issue the May 19, 2008 final judgment? It was requested by the CSX entities, Your Honor. Well, not all district judges do what a party requests, so there must have been some reason why Judge Brown saw it fit to issue that order. Did you have no notice of that request? Yes, we did, Your Honor. You resisted it? Did not, Your Honor, no. You did not? No, Your Honor. So why shouldn't we just take it at face value and treat it as the final judgment by making the appeal in 08-2553 time? Simply for the reason, Your Honor, that we believe it's a jurisdictional issue and there was no notice of appeal filed with respect to the January 2008 order, which was a separate document. Every separate order needs a separate notice of appeal? Is this how you want to spend your time arguing? Judge Barry, it was a separate claim. No, I understand that. And we've consolidated the two appeals, too. Well, we still have to decide. No, I understand that. Go ahead. I think it would be worthwhile to go to another issue. Okay. Well, let me go to the scope of the Carney Purchase and Sale Agreement, which we have held in our papers or posited in our papers should be reviewed under a clear error standard, and that's simply because the district court, in its summary judgment decision and in the trial opinion, cited ambiguities in Section 2.3 and held a five-day trial, examined numerous witnesses and significant evidence we believe it should be reviewed under a clear error standard. But the Section 2.3 itself that's relied upon by the appellant, if you look at that section, it has basically two categories of cleanup, and they're clearly separated by Roman numerals as very distinct actions. The first are government-mandated cleanups, and the second where the phrase appears, Your Honor, is for voluntary cleanups. And we believe that in each case is intended, as did the court, to modify the types of actions that could happen in a voluntary cleanup, meaning treat, remediate, dispose, which are all in that provision, as well as in the definition of cleanup. So it is not intended to modify small Roman numeral 1 in Section 2.3, but merely the actions that could be taken as part of a voluntary cleanup. I don't understand. Are you saying in each case doesn't modify subsection 1? Correct, Your Honor. It does not? It does not. It only applies to subsection 2? Correct, to the types of actions that are laid out in subsection 2, voluntary cleanups. And what do you say is the difference between the actions under subsection 1 and subsection 2? Government-mandated cleanups under subsection 1 are something that, like at issue in this case, the NJDEP directive that was issued to Bonacie and Motor Carriage. Really, I know the difference between when a government tells you to do something and when you do it voluntarily, but I thought you were talking in terms of what it is you have to do. You don't think that is at issue? No, I think in each case, Your Honor, is intended to modify the types of actions that are laid out in voluntary cleanups. And you think that the type of action required under subsection 1 is less comprehensive than that under subsection 2? No, I think subsection 1 government-mandated cleanups incorporates the definition of cleanup, which also includes some of those same types of actions, Your Honor. So is there any difference? I'm not sure. You've lost me. I mean, other than the fact that 1 is required by the government and 2 is voluntary, what's the difference? Well, go ahead. The difference is in that section, the drafters of the agreement put in a modifying clause that, in our view, pertains to the types of actions that could be undertaken as part of a voluntary cleanup. And therefore? It's a separately enumerated provision. And therefore, you are or are not liable for what? That's at issue in this case. I'm trying to take what you're telling me to a conclusion. Well, Your Honor, we don't believe that there's any ambiguity. The Court found some ambiguity in that phrase. Your argument is, isn't it, that the first section would cover pre-contract emissions, as well as post-agreement emissions, whereas Part 2, Subsection 2, would cover only post-agreement cleanup? Correct. Which, by its nature, voluntary cleanups. And we're talking here about pre-agreement emissions. So that's where you would distinguish between 1 and 2. Yes, Your Honor. And the voluntary cleanups could only occur after the effective date. And those voluntary cleanups could potentially involve substances that were disposed of before the effective date. And Subsection 2 of 2.3 clearly states that. Let me ask you a question. If you didn't have the words in each case, would it make a difference? Yeah, that's what I said. I don't see that it really makes – I mean, I don't know why it's in there, but I don't know that it makes a big difference in terms of – I mean, your position is that you're only liable to that, which you have to clean up before the agreement, and that motor carrier agreed to everything else, right? No, Your Honor. Our position is that we're not responsible for cleanups attributable to substances disposed of before the agreement. We're only liable for specific cleanup activities, which are very specifically enumerated in Subsection 2.2. But what difference does in each case make? I don't know why that's in there. I think it's basically referring to the different types of actions that could be involved, whether it's an investigation, a removal, or a disposal action as part of a voluntary cleanup. You suggested that there's nothing ambiguous in this language, as I understand it. I'm suggesting that within that – it's within a specific subsection that pertains to voluntary cleanups. And if I could also address the fact that the other sections of Article 2 would essentially be vitiated by the appellant's reading. And those provisions that cite to Monsanto's responsibilities in 2.2 specifically are limited to an administrative consent order cleanup with the DEP for soils and any groundwater cleanup that is triggered by monitoring associated with that soils cleanup. And I think that's clear. Let me try and make a little more precise what my concern is. Judge Brown says that, quotes, the only ambiguity in the language of the provision remains the time limitation, quotes, any time after the effective time. And I understood you to say that you did not perceive ambiguity there, but you thought Judge Brown was wrong in finding this ambiguous. We have not taken issue with Judge Brown's decision in the summary judgment stages and during the course of the trial. We took the position it was unambiguous. Correct. It was unambiguous. But Judge Brown saw it otherwise. Now, a friend has told us that under New Jersey law, both the construction and interpretation of a contract are matters of law. But I think you take a different view. Well, I think, Your Honor, you're referring to the decision that was raised in the reply brief. It was not raised in the opening brief as it should have been, and therefore I think it's waived. However, the Ramos decision applies to a situation that doesn't exist here. And that's a Supreme Court of New Jersey decision. In that case, there was not unequivocal language that the indemnity would be indemnified for its own long doing. In this case, there is unequivocal language that Motor Carriers is responsible for cleanup costs, whether or not these substances were disposed of by Monsanto. There's also Third Circuit decisions that address this directly in terms of Ramos, both the Caldwell trucking case and the Smith-Klein Beecham case, which we would have raised had it been identified in the opening brief. In both those cases, the Third Circuit found that when you're dealing with an arm's length negotiation between sophisticated parties, Ramos should not apply. Well, you know, Ramos aside, I think their position of your friends across the aisle from day one has been it's de novo review here, even in the opening brief. Whether they're right or wrong is another matter, but I don't think they've ever taken any other position. Did you object to having a five-day hearing? Why would there have been an evidentiary hearing if it was a matter of law? Your Honor, because Judge Brown's summary judgment found that there were issues relating to the geographic application of the terms, whether or not off-site contamination was addressed with respect to the temporal issues, whether or not it occurred before or after the effective date, and with respect to qualitative application of the contract, i.e., whether or not it was intended to cover sediment and surface when we were cleaning up. All of those issues, evidence was presented at trial to address all those issues, and the Court ruled in Pharmacy's favor after reviewing all the evidence. And that hasn't been raised on appeal? Those issues haven't been raised on appeal? The kitchen sink has been thrown at us in this case, Your Honor, and most of those arguments have been abandoned on appeal. Okay. So that you understand CSX's, and that's encompassing all of them, position should be that what's left is a matter of law, and that, therefore, we don't have to give any deference, if that's what you call clear error review, to any findings of Judge Brown? That is CSX's position. And your position is? Well, frankly, I think the result is going to be the same under either standard, but I think our position is laid out in our briefs that the Court found ambiguity, and, therefore, there should be a review based upon clear error. Review based on? Clear error. I'd like to address a couple of additional issues, because my time is running out here. With respect to the prejudice issue, as the Court has already identified, Clearly you didn't give notice as required. Your Honor, I mean, don't we have to take that as a given? Leave it, you know, that's first before you get to the prejudice issue. I mean, Judge Brown found you had, but that's not a correct, that's an alternative holding, and you don't seriously suggest that you gave notice within the meaning of the requirements of the agreement. When motor carriers was taken over by CSX. That's a yes or no. I was going to say the same thing. Yes, I take issue with that, Your Honor. You do. We do believe, as Judge Brown found, that there was notice given, because the notice letters, the 104E request letters from EPA, specifically dealing with the Mosaic River, were found in the files of motor carriers. The notice requirements, though, under, you need the language of the notice provisions, 9.12, 9.8B, there was no compliance with those. That's right. Any government request, or et cetera, they're very broad. Any communication. That's right. Pharmacia was not able to produce a document from its own corporate files that demonstrated notice was given, but there were documents found in motor carriers' files, which evidenced that they were clearly aware of the Mosaic River problem. But aware is not the notice that you were required to give under the agreement. There were time constraints. There were specific requirements. That I, frankly, speaking only for myself, I believe were not complied with. That does not mean that you weren't, you know, they were prejudiced. That's right. That was my question. What I'm, my question is, there's an alternative holding by Judge Brown that you, indeed, gave notice. I suggest that alternative holding is wrong. We were not able to demonstrate that we gave notice, nor was motor carriers. And therefore, there was nothing in the record to show that you gave notice. Other than the documents that were found in motor carriers' files, which were never collected by CSX when they acquired the company. They left them with the lawyers. That doesn't matter. If you gave notice, if you had a document showing this is a copy of a notice that we sent, that would be in the record. And it's not in the record. And you say you can't find it. And we have to assume, therefore, that there was no notice. I mean, this was, it was my throwaway question before I got to the next one. And then, but you're, you're, you're contesting that. We don't, there's nothing in the record that I can check, that I can see that says you gave notice. There is. And you had an obligation to give notice, not to go through, not that they go through the files and find something that may suggest it. You have to give notice. We don't see any notice. You're referring, Your Honor, to the first study, which pertained to the lower six miles. We can demonstrate we gave notice pursuant to the contract. For a distinct claim, for the study that pertains to the 17 and a half miles of the Passaic River. You mean the March 2004 notice? Correct, Your Honor. I believe it was September. This all started in 1995. Nine years earlier. There were requests.  There were all kinds of things. Notices of potential liability. Invitations to participate. None of which do we see. Frankly, I think you should move to the prejudice problem. Me too. I thought we were there when I asked my question. I'll move to the prejudice problem. I mean, if nothing else with notice, you're supposed to do it within five days. There's no evidence, or 20 days, whatever it is, the various provisions. There's no evidence when these things were said. Okay. So let's go to prejudice. Well, on prejudice, I think the most important point is that a demonstration of prejudice is specifically required under Section 9.12 of the contract. So regardless. Okay. Mr. Englert said we were prejudiced because of X, Y, Z. How do you answer that? There's nothing in the record to support what he said. Nothing happened to Pharmacia as a result of not responding to the 1996 general notice letter from EPA. And no one else signed up. He said that they could have shown that there was no, nothing, there was no, it didn't get, whatever it was that shouldn't have gotten out of there didn't happen. Right? I mean, isn't that the case? He speculated. No migration. Thank you. He speculated that a letter from a consultant would convince the EPA not to pursue Pharmacia. However, there are 75 companies at this point who have seen the risks here are tremendous and have also elected to sign up to the settlement with EPA. That's the $10 million? The initial settlement, Your Honor, was a $10 million payment to EPA to complete the RFS for the lower 17 and a half mile study. And there is a subsequent settlement, which I don't know if it's part of the record, Your Honor, but to do an RFS, to take over the RFS, which is a $50 to $100 million study that's been taken on by the potentially responsible parties. If I could just address the veil piercing. I've run out of time here. Oh, no, that's okay. We gave him extra time. I wanted to ask you about the veil piercing, but go ahead. You go first. I think that the fact that there's absolutely no evidence in the record whatsoever that corporate formalities were followed, that they could meet the financial assurance requirements posited by Monsanto in response to the 1997 transaction, and to say that because the property sold to CSX, which had a unique need for this property for $14.5 million is evidence of the net worth of the company. It's just simply not true. Okay. Leaving our intermodal now and go to CSX. How did CSX, what's the evidence to show that CSX agreed to become, or we should treat it as an assurance affiliate, which the district court found? I mean, how can we hold the, they never agreed to become an assurance affiliate, so how can we hope that they became one? Well, Your Honor, we believe, and the court found that they did agree to become an insurance affiliate. Where is that? I mean, I know the court found it. There are a series of three letters in the record that require scrutiny. The first is a request from Mary Cody at Solution, which was related to Monsanto. Specifically, a January 5th, 1997 letter after they learned about the stock purchase transaction, which was originally going to be a purchase of real estate. When they did the due diligence, it became a stock purchase transaction. But there's a letter requesting specifically that Motor Carrier provide evidence of $5 million of net worth, or cause assurance affiliates. The word is used is affiliates in the letter from Mary Cody, who can demonstrate the net worth. That letter was then transmitted to CSX by Brian Fleissig, who was the attorney at the time for Motor Carrier. He called specific attention to Monsanto's request for financial assurance or an affiliate. And they responded, CSX responded, CSX Intermodal, in a January 7th, 1997 letter from Charles McSwain. What day was that? January 7th, 1997. January 7th, okay, but that's intermodal. I'm talking about CSX because there are three parties. One is Motor Carrier, one is Intermodal, and one is CSX. And the district court found, now I will ask on rebuttal whether it makes a difference, but my guess is it does make a difference. CSX is a big company. It's probably got more assets. And how did it become, what's the evidence that it became an assurance affiliate, which Judge Brown found? The correspondence I referred to. Okay, so we have this letter of January 7th. You don't happen to know what page of the appendix it's on, do you? That enormous appendix. Not offhand, not offhand. The district court held only that Motor Carrier is effectively a wholly owned subsidiary of CSX, and that Motor Carrier's net worth was valued in October 1997 at $340,000. From that, I think you have to say that the district court must have found either that Motor Carrier's net worth, when it failed to respond to Mary Cody's request, or that the affiliates automatically become assurance affiliates under the agreement when Motor Carrier's net worth drops below $5 billion. That's what the agreement provides, Your Honor. Yes, but he didn't specifically say, Judge Brown didn't specifically make those two findings, did he? I believe he did make the specific finding that CSX became an assurance affiliate by virtue of the letter provided by Mr. Charles McSwain on January 7th, 1997. And you said there were three letters, so you've told us about January 5th and January 7th. What's the third one? It's a letter from Brian Fleissig of Motor Carrier to Mr. Edward McTiernan, specifically pointing his attention to What's the date of that letter? I believe it's a January 5th, 1997 letter from Brian Fleissig of Pierce Masler, the lawyers that represented Motor Carrier's in the stock purchase transaction, as well as the 1994 purchase and sale agreement. It said what? It points the CSX lawyers to Solution slash Monsanto's request for financial assurance and demonstration of net worth. So is it, oh, wow. 1319. Yeah. 1319 request. Is it your position that we should hold that Judge Brown didn't err when he said that CSX became an assurance affiliate because it didn't provide information that Motor Carrier had $5 million? No, Your Honor. I'm saying that the section 13.19 of the agreement requires that affiliates automatically become assurance affiliates when the demonstration of net worth is not provided. 13.19. And CSX and CSX Intermodal will identify by affiliates in the record. No. Isn't there a process that describes how affiliates become assurance affiliates in 13.19? Yes, Your Honor. But that process wasn't followed. The process was followed when Monsanto sought assurance, and it had to be provided in a form that was satisfactory to Monsanto, and Monsanto found Mr. McSwain's letter to be satisfactory. I'm not sure about that. Okay. Yeah, neither am I. Do you have any more questions? No. Thank you very much. Thank you very much. Mr. Englert, I would like to keep on this last point, which is the finding that CSX was or is an assurance affiliate. First of all, does it matter to you if we hold that the corporate piercing was not a violation of law or use of discretion, and therefore that Intermodal is in with Pharmacia, does it matter whether CSX is in or not? I think so. I think in a publicly traded company of this sort, establishing which corporate entity has which liabilities is a matter of some importance regardless of ability to pay a particular judgment. Does Intermodal have enough? I don't think it's in the record, but do they have enough assets to pay the potential liability? Oh, it's not in the record, as you point out, Judge Lovera, but I think it has, I hope it doesn't come to this, but I think Motor Carrier has many times the assets necessary to pay the likely share of 1% or less of the covers that Mr. McSwain has. Why is it a matter of importance beyond whether Intermodal can pay? Simply because... You said that it was a matter of importance whether CSX... There are reporting obligations for publicly traded companies to say who's liable for what, and I'm frankly speculating, Judge Pollack, I'll admit that, but I think it is of some importance even beyond ability to pay which corporate entities have which liabilities. Yeah, but is it up to this Court or indeed up to you and your clients to determine whether the regulatory process, do we determine it in the scope of... No, but what I think is up to this Court is to decide whether Judge Brown got it right or wrong on an issue that was presented in the case below and is on appeal. Now, since we're on the question of assurance affiliates, let me, for the Court's benefit, say the letters Mr. McGarren was referring to are at pages 1665, 1667, and 1840 of the Joint Appendix. Thank you so much, because I could see sending a law firm to work till midnight to find those pages. Well, they're all in Volume 6 of the Joint Appendix of those pages. Not one of them mentions assurance affiliates. That phrase is never used. So the idea that this was the process contemplated by 13.19 of designating an assurance affiliate and having Monsanto accept that, that's just not true. That argument can't be sustained, nor can the argument be sustained that the process is automatic. The purpose of Section 13.19, the obvious purpose, is to have someone with at least $5 million of assets available, not to have multibillion-dollar companies automatically made assurance affiliates. That's not what 13.19 is about at all. Now, reverting back to a much- On the other hand, whether the corporate veil was pierced is another issue. Sure. But I do respectfully suggest that the only supposed injustice Judge Brown found was an inability to pay the judgment, which is, I think, not correct anyway. But even if it were correct, it wouldn't have anything to do with the test for veil piercing. If you look either at the recent opinion by Judge Smith for a panel of this court piercing the veil in a case whose name I've forgotten, or if you look at the 20-year-old opinion by Judge Sloboda for a unanimous panel reversing a veil-piercing decision under New Jersey law, the test is much more stringent under the Bentron case. I'm not sure that's the law, but go ahead. Okay. Which judge solid are we talking about? But, well, does Motor Carrier have the assets to pay a judgment of the kind that we're talking about, which I gather can be multi-multi-multi-millions when it finally comes to the end? Nobody knows the answer to that question, Your Honor. I don't know it. Mr. McGarren doesn't know it. But that's what Judge Brown was concerned about, wasn't he? Well, sure, but that's not the test. And the only evidence he found was the $340,000 evaluation. But that was a valuation before a $14.5 million transaction. And CSX and CSX Intermodal and CSX Real Property did not own Motor Carrier at the time of that valuation. They came in and, notwithstanding that valuation, paid $14.5 million. What a willing buyer pays to a willing seller is much better evidence of value, and it's the only post-1998 evidence of value in this case. But what they wanted really was a place to put their rail cars, and had nothing to do with the potential liability for all of, at that time. That's absolutely correct, Judge Sloboda, because they didn't believe they were taking on that potential liability in addition to other reasons. Well, they obviously were taking on some potential liability. They certainly knew there were problems, but the agreement was all about it. That's what the agreement is for, to divide the liability, responsibility. That's correct. If something went wrong on site that wasn't covered by the administrative consent order with New Jersey, it's crystal clear that's Motor Carrier's problem, not Pharmacy's. That's what the agreement says in Article 2. But what Article 2.3 says is if we're dealing with migrations, and we have a government-ordered or voluntary cleanup, in each case there is liability only for migrations after the effective time. Now, Mr. McGarren says, in each case refers to the immediately preceding language. But that just can't be right. First of all, as Judge Sloboda pointed out in questions from the bench, that makes the language in each case surplusage. Second, that phrasing about investigate, remediate, and so on, appears in more than one place in the agreement. It appears in 2.1c in the definition of cleanup, for example. It's never followed by in each case to refer to each of the possible types of remediation. Instead, in each case, naturally and necessarily refers back to Roman I and Roman II in Section 2.3. Now... It's pretty clear from the other provisions in the contract that there was a division between what happened before and what happened after the agreement. And, well, we have to work that out. Yes, but our respectful submission, Judge Sloboda, is that in the case of migrations of substances, the liability was divided quite naturally depending on whether the migration occurred while Monsanto was running a chemical plant on the property or while Motor Carrier was using it as a parking lot. As we read 2.3, and in particular the in each case language, it made Monsanto liable for what happened while Monsanto owned the property, including migrations that happened while Monsanto owned the property, and made Motor Carrier responsible for migrations that happened while Motor Carrier owned the property. Very natural reading. Now... Do you have a lot more to say? Not a lot more. A little more, if I may. Yeah. Standard of review. Mr. McGarren asked you to defer to the district court's supposed finding that the agreement is ambiguous. But under Third Circuit law, the Teamsters v. Rolls-Royce case, as well as New Jersey law, whether an agreement is ambiguous is a question of law. So, really, this court does have to engage in de novo review of whether... That's a question of law, and then it's my understanding, and I could be wrong, that then interpreting the ambiguity would be a question of fact. Well, two responses, if I may, Judge Berry. Number one, I don't think that's right under New Jersey law. I simply invite you to look at the cases. But number two... She said she was a New Jersey judge. Oh, I'm well aware of that. That doesn't mean I know anything, any New Jersey law. But second... And she argued, when she was still a lawyer, she argued before me all about New Jersey law. But go ahead. Okay. Second, there is a very important principle of New Jersey law that ambiguities are construed against the indemnity. So if there is an ambiguity in this case, I think the result is we win, not we lose. Okay. All right. Thank you. All right. Thank you very much. Excuse me. Do you have any more questions? No, no. Mary Ann? No. Okay. Thank you, General. We will take this under advisement.